IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

TROY REAGAN DOUD,                §
                                 §
              Petitioner,        §
                                 §
v.                               §        No. 4:18-CV-220-Y
                                 §
LORIE DAVIS, Director,           §
Texas Department of Criminal     §
Justice, Correctional            §
Institutions Division,           §
                                 §
              Respondent.        §


## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254 filed by Petitioner, Troy Reagan Doud,
a state prisoner, against Lorie Davis, director of the Texas
Department of Criminal Justice, Correctional Institutions Division,
Respondent. After having considered the pleadings and relief sought
by Petitioner, the Court has concluded that the petition should be
denied.


## I. FACTUAL AND PROCEDURAL HISTORY

On August 19, 2014, in Erath County, Texas, Case No. CR13944,
a jury found Petitioner guilty of murder in the shooting death of
Jeffery Vegas Sewalt and the trial court assessed his punishment at
life imprisonment. (SHR[1] 155, doc. 16-44.) Petitioner appealed his
conviction, but the state appellate court affirmed the trial

---

[1] "SHR" refers to the record of Petitioner's state habeas proceeding in WR-88,011-01.

court's judgment and the Texas Court of Criminal Appeals refused his petition for discretionary review. (Docket Sheet 2, doc. 3-2.) Petitioner also filed a post-conviction state habeas-corpus application challenging his conviction, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court. (SHR 2-23 & Action Taken, docs. 16-30 & 16-27, respectively.)

The state appellate court summarized the evidence at trial as follows:

> A.   *On February 1, 2013, Shannon Palmer discovered the victim's body at his home, and law enforcement investigated.*
>
> Shannon Palmer, the victim's girlfriend, discovered his body at his home on Pigeon Road. After a call from the chief deputy of Erath County, Texas Ranger Danny Briley arrived at the victim's residence. He found that someone had shot the victim in the head. Ranger Briley did not see any signs of a forced entry or physical struggle, but he did notice a scuff mark on the breezeway door, which was the door closest to where the victim's body was found. He thought that the victim might have opened the door for the assailant who shot and killed him. While law enforcement was still at the victim's residence that day, [Petitioner] appeared at the entry gate of that residence, spoke to police, appeared nervous, and then gave them his contact information and said something about a "foreign job." A few hours later, Ranger Briley contacted [Petitioner]. Ranger Briley met [Petitioner] at the sheriff's office at approximately 10:00 p.m. that night. Ranger Briley testified that [Petitioner] said that he went to the Allsup's store located at Highway 108 and South Loop 377 that morning; then spoke to Luke Groth on the south side of Stephenville; then may have gone to Ace Hardware, also on the south side of town; went home; and possibly went to watch Martin Lucero with his horses. Later in the afternoon, [Petitioner] picked up his daughter from school. Ranger Briley could not verify all this

information, so he investigated [Petitioner]'s whereabouts on the day of the murder and his relationship with the victim.

Ranger Briley discovered that [Petitioner] spoke to the victim at about 9:28 a.m. on the morning of the murder. The last call made on the victim's phone occurred at 10:28 a.m.; an incoming call at 11:09 a.m. went unanswered. During the initial interview with law enforcement, [Petitioner] explained that the victim had loaned him $16,000 around Christmas and held the title to [Petitioner]'s Dodge pickup as collateral. [Petitioner] reported that he had repaid the victim in the amounts of $12,000, $2,500, and $3,500 for a total of $18,000 dollars. On February 13, 2013, police searched [Petitioner]'s home and found the title to his Dodge pickup. [Petitioner] claimed that he had repaid his loan and had gotten the title to the pickup back from the victim.

The victim's daughter, Jetonna Dee Gilliam, explained that [Petitioner] had borrowed $16,000 from her father, who ran a wholesale car dealership business, and that [Petitioner] used his pickup title as collateral. Gilliam said that her father told her that [Petitioner] had not repaid the loan, and that he still had the title to [Petitioner]'s pickup two days before the murder. Travis Saunders, a friend of the victim, explained that the day before the victim was murdered, he and the victim talked about Saunders buying [Petitioner]'s pickup. John Guest, the president and chief executive officer of Citizens National Bank, said that the victim had a "floor plan note" for financing vehicles and that [Petitioner]'s Dodge pickup, beginning on December 21, 2012, was part of that plan. Bank records did not reflect any payments for the loan of $16,000 on that vehicle.

Ranger Briley questioned Palmer and the victim's friend, Curt Garrison, both of whom had been living at the victim's residence, about their whereabouts. On the day of the murder, Palmer went to Weatherford in the morning and returned to Stephenville around 2:00 p.m. to find the victim's body at the residence. Ranger Briley was able to confirm both Palmer's and Garrison's alibis.

Palmer told law enforcement that she and the victim had planned to leave for a cruise on February 2. She also said that [Petitioner] had come to the residence on

January 28 looking for the victim; he left but later
returned to talk to the victim. Melissa Koonsman
corroborated Palmer's testimony about the planned cruise
because the victim told her about the cruise the morning
that he was murdered. She testified that the victim came
to see her at Holland Chiropractic for an appointment
that morning. Patsy Walker, a bookkeeper for Garrison,
explained that she helped the victim with some of his
business deals and said that he had come to the office
that morning. She explained that the victim wanted to
leave [Petitioner]'s pickup title with her and told her
that, if [Petitioner] paid her, then she could give the
title back to [Petitioner]. He put the title on her desk,
but then took it back and said he would return it to her
later that day. Also between 10:00 a.m. and 11:00 a.m. on
the morning of the murder, the victim went to see Victor
Wayne McKinley, who had a trailer repair business. The
victim went to McKinley's residence and paid for repairs
to two trailers, and he took one of the trailers with
him. The victim said he would come back in the afternoon
to get the second trailer.

B.   *Law enforcement reconstruct the victim's and
     [Petitioner]'s movements on the morning of the
     murder.*

Law enforcement secured security-camera recordings
from the courthouse and the hospital in Stephenville.
Jeremy Woodruff, an investigator with the Erath County
Sheriff's Office, reviewed those security-camera
recordings to verify the victim's and [Petitioner]'s
movements from 10:00 a.m. to noon on the morning of the
murder. Investigator Woodruff determined that the victim
drove his pickup and trailer in a northerly direction
past the front of the courthouse annex at 10:35 a.m. Less
than a minute later, [Petitioner]'s Dodge pickup appeared
in the video traveling in the same direction as the
victim. At 10:35 a.m., the hospital security-camera
recordings showed the victim's pickup and trailer
traveling in a northerly direction. Again, less than a
minute later, [Petitioner]'s pickup appeared behind the
victim traveling the same direction. At 11:11 a.m., the
hospital's security-camera recorded [Petitioner]'s Dodge
pickup traveling in a southerly direction. Based on his
investigation, Investigator Woodruff thought the time of
death for the victim was between 10:30 a.m. and 11:00
a.m.

Brian Tripp, a research specialist with the Texas Department of Public Safety, testified about the cell phone mapping that he had done in this case. Engineer Tripp explained the general location of [Petitioner]'s phone at around 10:30 a.m. on the morning of the murder, when it "pinged" cell towers. During this time, the phone pinged and started in the green sector and then moved through the blue sector to the purple or pink sectors near the victim's home, as shown on State's Exhibit No. 57. An hour later, at approximately 11:30 a.m., [Petitioner]'s phone pinged the towers in the green sector, which is near [Petitioner]'s home. [Petitioner]'s phone traveled from the green sector to the pink sector during the time period in which Investigator Woodruff thought the victim had been murdered.

[Petitioner] never mentioned to Ranger Briley that he had gone north of Loop 377 on the day of the murder. [Petitioner] never mentioned the post office, the hospital, the Pigeon Road Shooting Range, or the roller rink, which are all located north of Loop 377. Ranger Briley used video from surveillance cameras that showed [Petitioner] was at or near two of these unmentioned locations on the day of the murder. Ranger Briley also used cell phone information to show that [Petitioner] was north of Stephenville near the victim's house at around 11:00 a.m. that morning.

C.  *The medical examiner completed an autopsy of the victim, and a ballistics expert tested certain evidence for gunshot residue.*

Dr. Jill Urban, a medical examiner, completed the autopsy of the victim. She found three gunshot wounds to the head—one to the left and right sides of the head and one to the back of the head—all three at close range, as evidenced by the "stippling" near the wounds. She recovered the bullets from the victim's body and determined that the gunshot wounds, which were lethal, were not self-inflicted, and she ruled that his death was a homicide. David Spence, the trace evidence supervisor at the Southwestern Institute of Forensic Sciences in Dallas, testified that he tested ten samples collected from the orange pullover that belonged to [Petitioner], four of which tested positive for gunshot residue. Although [Petitioner] owned a .22 pistol, which was tested, it did not match the ballistics for the bullets removed from the victim's body.

5

(Mem. Op. 2-6, doc. 13-4 (footnote omitted).)

## II. ISSUES

In five grounds for relief, Petitioner claims that the state habeas court erred by—

(1)     denying his ineffective-assistance-of-counsel claim based on a "conflict with the Fourth Circuit";

(2)     denying his claim that the trial court's instruction to the jury to "not concern [themselves] with any objections or my ruling" was improper and unreasonable;

(3)     denying his prosecutorial-misconduct claim for violation of the ABA Model Rules;

(4)     denying relief "for abuse of discretion by the trial court for allowing statements of an interrogation taken absent *Miranda* warnings"; and

(5)     "failing to address [his] claim that the cellphone evidence was insufficient."

(Pet. 6-7, doc. 1.[2]) In a sixth ground, Petitioner claims the state appellate court erred by denying his sufficiency-of-the-evidence claim. (Id. at 8.)

## III. RULE 5 STATEMENT

Respondent believes that Petitioner has exhausted his state-court remedies as to the issues raised and that the petition is neither untimely nor successive. (Resp't's Answer 7, doc. 12.)

---

[2]Because pages are inserted into the form petition, the pagination in the ECF header is used.

## IV. DISCUSSION

### A. Standard of Review

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). See 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. *See* 28 U.S.C. § 2254(d)(1)–(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet but "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

The statute also requires that federal courts give great deference to a state court's factual findings. *See Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. This presumption of correctness applies to both express and implied findings of fact. *See Valdez v. Cockrell,* 274 F.3d 941, 948 (5th Cir. 2001). A petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell,* 537

U.S. 322, 340 (2003); *Williams v. Taylor,* 529 U.S. 362, 399 (2000).

Additionally, when the Texas Court of Criminal Appeals, the state's highest criminal court, denies relief on a state habeas-corpus application without written order, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *See Singleton v. Johnson,* 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). In such a situation, a federal court may assume that the state court applied correct standards of federal law to the facts, and, if applicable, "should 'look through' the unexplained decision to the last related state-court decision providing "particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Wilson v. Sellers,* 138 S. Ct. 1188, 1191-92 (2018); *Townsend v. Said,* 372 U.S. 293, 314 (1963).[3] With these principles in mind, the Court addresses Petitioner's claims.

**B. Ineffective Assistance of Counsel**

Under his first ground, Petitioner claims that his trial counsel was ineffective by failing to hire an expert to determine the time of death of the victim, an expert in cell-phone-tower data, and an expert in gun-powder residue and by failing to have DNA on a toothpick found next to the victim's body tested. (Pet. 6,

---

[3]The standards of *Townsend v. Said* have been incorporated into 28 U.S.C. § 2254(d). *See Harris v. Oliver,* 645 F.2d 327, 330 n.2 (5th Cir. 1981).

doc. 1.)

In the state habeas proceeding, counsel responded to Petitioner's claims in an affidavit, in relevant part, as follows (any grammatical, punctuation, and/or spelling errors are in the original):

> I have reviewed the 11.07 Writ Application at length. [Petitioner] asserts seven (7) grounds in support thereof. To the extent that each of the grounds allege that my representation was ineffective under the law, I strongly deny those accusations. Every decision made in the representation of [Petitioner] was done so under the auspicious of sound trial strategy, which sought to negate and/or provide alternative theories to the State's circumstantial-evidence-based case against [Petitioner].
>
> Further, [Petitioner] was fully-aware of, and agreed fully with, my trial strategy. In addition to the overall "strategy," [Petitioner] was also aware of the smaller "tactical" decisions made in support of the strategy. He was also in full agreement with the "tactical" decisions. At all times during the defense investigation and subsequent trial preparation, [Petitioner] was repeatedly contacted and consulted by either myself, or Defense Investigator Bray. [Petitioner] approved and adopted the strategy of his defense. [Petitioner] never expressly or impliedly indicated that he in any way disagreed with the overall defense strategy.
>
> In support of my representation of [Petitioner], I sought and received the assistance of a court-appointed investigator, Mr. George Bray, a Gun-shot Residue Expert, Mr. Richard Ernest, and a polygraph examiner, Mr. Eric Holden. Each of these individuals were well qualified to act in their respective support positions.
>
> Mr. Bray, a former Ft. Worth Police Department Officer, and multi-year experienced private investigator, interviewed numerous witnesses and tirelessly chased down numerous leads. Despite his work, Mr. Bray was unable to find any evidence or witnesses that we ([Petitioner] inclusive) believed necessitated presenting to the jury in form other than that of cross-examination of State witnesses and argument thereafter. We ([Petitioner]

9

inclusive) believed that shaping the narrative of the State's circumstantial-evidence case through cross-examination (rather than open-ended direct-exam of a defense witness) was the soundest strategy.

From the onset, District Attorney Nash freely conceded the State's case was one of circumstantial evidence. In the months before trial, Mr. Nash was very clear that he would entertain any form of evidence (legally admissible or not), which would tend to show that [Petitioner] did not kill Mr. Sewalt. In conversations that both myself and Mr. Bray had with [Petitioner], he was adamant that he did not commit the crime. Crucially, however, [Petitioner] simply could not provide us with any objectively verifiable alibi evidence.

On numerous occasions before trial, Mr. Nash made clear that in the absence of anything else to support [Petitioner]'s naked claims of innocence, he (Nash) would entertain a "passed" polygraph report in his (Nash's) evaluation of the State's position in terms of either guilt or mitigation of punishment. This information was related to [Petitioner], who (without the State's knowledge) agreed to be administered a polygraph exam. I applied for and received Court approval to hire a polygraph examiner. I chose Mr. Eric J. Holden, who is one of the most preeminently known and respected polygraph examiners in Texas. Mr. Holden's conclusion regarding [Petitioner]'s polygraphed answers to relevant questions, and an accompanying written report to the defense was not favorable. Therefore, the results were not shared with the State.

Further towards responding to [Petitioner]'s Writ accusations:

1.   GROUND ONE: Trial Counsel was ineffective for failing to present expert testimony to rebut the states (sic) theory on time of death.

In his "facts" supporting GROUND ONE, [Petitioner] accuses trial counsel (me) of being ineffective for "fail[ing] to seek an expert to review the autopsy report, which would have *probably made the State's burden of proof much higher.*" It is axiomatic, black-letter-law that the State's Burden of Proof in a criminal case is "Beyond a Reasonable Doubt." There is no mechanism under

the law to change (increase) the State's burden of proof. Therefore, I had no way under the law of changing the State's burden of proof. The jury was appropriately instructed by the trial court regarding the burden of proof in this case. The same was emphasized directly and indirectly by both myself and District Attorney Nash on numerous occasions, including, but not limited to, voir dire, and closing arguments.

In the instant case, the decedent's cause of death was never reasonably in dispute. Mr. Sewalt died from sustaining gunshot wounds to his head. [Petitioner]'s "Facts Supporting Ground One" assert that numerous other people may have had motive to kill the victim. Among other ancillary strategies, the crux of our trial strategy was to challenge the circumstantial nature of the State's case as being facially insufficient to prove guilt beyond a reasonable doubt. Buttressing this strategy was presenting the jury with alternative suspects with colorable motive to benefit from the death of Mr. Sewalt. Towards that end, the defense repeatedly questioned witnesses and challenged evidence on those grounds. Numerous other people were interviewed and investigated by the Texas Ranger, The State's investigator, and other law enforcement officials. Still others were interviewed by Defense Investigator Bray. Despite several criminal investigators (prosecution and defense) having interviewed numerous people, no tangible proof linking one person over another as being responsible for the killing was located.

Obviously, D.A. Nash provided me copies of his non-work-product files. Defense counsel, both alone and through the assistance of Investigator Bray, researched and interviewed numerous individuals who either had a colorable motive to want Mr. Sewalt dead or were able to speculate upon someone who might. Tellingly, the defense (inclusive of [Petitioner]) was unable to procure any evidence other than naked conjecture that someone other than [Petitioner] was the killer.

Although the defense has no burden to show proof under the law, presenting proof to the jury in this area, if we had any, would have been a decision that a 1-L student would have correctly made. In this context, the defense was in the same evidentiary position as the State, unable to present any admissible evidence directly linking anyone to the killing. Throughout my questioning

of witnesses at the trial, and arguments thereafter, I offered the jury several other alternative suspects who possibly had a motive to want Mr. Sewalt dead. In the trial, I questioned law enforcement investigators about others with possible motive to benefit from Mr. Sewalt's death. Despite the numerous other alternate suspects with motive, the jury decided to disregard all other possible actors and convict [Petitioner]. Although not specifically alleged in GROUND ONE, in his brief and argument in support thereof, [Petitioner] further accuses me of being ineffective for not seeking the assistance of an expert witness to challenge the "cell phone sector data." Such an expert was not necessary. The State's cell-tower information witness simply took objective information regarding the interaction by and between [Petitioner]'s cell phone and corresponding nearby cell-towers and plotted it on maps and diagrams for the jury to evaluate. The State's witness was only able to testify in generalities about how cell phones, like [Petitioner]'s, interacted with cell towers. Through cross-examination, and corresponding arguments, I was able to control the narrative of the defense's position that the cell-data location lacked substantive important details.

Controlling the (cell-tower) witness through cross-examination allowed me to sufficiently point out numerous inconsistencies, or alternative theories to, the true and correct relative position of [Petitioner]'s cell phone to Mr. Sewalt's residence during the relevant time frame. An expert witness for the defense in this regard simply would not have exposed any material information, which was not otherwise clearly fleshed-out for the jury by controlled cross-examination of the State's witness. Further, as with [Petitioner]'s allegation that I should have hired an expert to challenge Mr. Sewalt's time of death, the want of an objectively verifiable alibi for [Petitioner]'s whereabouts further contributed to the decision that a "cell-tower" expert was not necessary.

. . .

6. GROUND SIX: Was trial counsel ineffective for not seeking to obtain an independent test of gunshot residue taken from a jacket to rebut the State[']s expert testimony[?]

Although phrased as a question, my response below

will address this GROUND as if it were an allegation. The defense asked for, and was appointed, funds to hire a Gun Shot Residue (herein "GSR") Expert. Mr. Richard Ernest is a well-known and qualified GSR expert. After analysis, Mr. Ernest provided a written summation of his findings to wit that GSR is commonly comprised of sub-microscopic particles of three elements, Barium, Antimony, and Lead. Mr. Earnest determined that particles of Barium and Lead were found upon [Petitioner]'s person and/or clothing [Petitioner] was wearing; the element Antimony was notably missing. Despite the missing element (Antimony), Mr. Ernest was of the opinion that [Petitioner] and/or the clothing he was wearing were, at some time, exposed to GSR.

Notably, Mr. Ernest buttressed his "positive" GSR findings with the fact that available data could not determine the source or origin of the GSR, i.e. where and/or when [Petitioner] was exposed to the GSR or whether or not the GSR found was from direct contact with a firearm or an environment rich with GSR particles, such as a police car or station. The defense team ([Petitioner] inclusive) made the obvious choice that calling Mr. Ernest to testify as a defense expert was contra-indicated. The source and origin questions were best presented to the jury in the controlled cross-examination of State witnesses. Despite numerous alternative theories, the jury chose which theory it wanted to believe.

7.   GROUND SEVEN: Defense counsel's failure to have a toothpick tested that was found next to the victim's boot was deficient, not strategy.

This GROUND presumably alleges that the toothpick found at the crime scene should have been tested for DNA. Hiring an expert to test for DNA on a random toothpick found at the crime scene was not necessary to achieve the goals of defense strategy. In fact, the "unknown" nature and quality of this toothpick played directly into defense allegations of crime scene mismanagement. There was testimony from State witnesses that the toothpick was likely inadvertently dropped by an investigating officer. Subsuming the State's position that the toothpick likely came from a peace officer dovetailed well into the defense's position that, on top of only having circumstantial evidence against [Petitioner], poor investigative techniques were used at the crime scene. I

> believed then, and believe now, that this was the best
> way to address the toothpick. [Petitioner]'s assertion
> that a police officer should have been accused of being
> a viable suspect are contrary to common sense in this
> instance.

(SHR 140-49, doc. 16-42 (emphasis in original).)

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey,* 469 U.S. 387, 396 (1985); *Strickland v. Washington,* 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland,* 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697.

In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. Where a petitioner's ineffective-assistance claims have been reviewed on their merits and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the *Strickland* standard in

light of the state-court record. *Richter,* 562 U.S. at 100-01 (quoting *Williams,* 529 U.S. at 410); *Bell v. Cone,* 535 U.S. 685, 698-99 (2002). Thus, a federal court's review of state-court decisions regarding ineffective assistance of counsel must be "doubly deferential" so as to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow,* 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011)).

Based on his own observations of counsel's performance at trial, the state habeas judge found that counsel's affidavit was credible and that counsel's representation throughout the proceedings was reasonably "adequate, effective and professionally done." (SHR 150, doc. 16-43.) The court also found that counsel was "adequately assisted" by an investigator, a gunshot-residue expert, and a polygraph examiner, "each of whom were adequately credentialed as experts in their respective fields." (Id. at 151.) Based on its findings, the court determined that counsel rendered reasonably adequate representation of Petitioner. (Id.) Assuming that the state courts applied the *Strickland* standard in their legal analysis, Petitioner fails to demonstrate that the state court's decision was contrary to, or an unreasonable application of, the *Strickland* standard.

Post-conviction claims of "uncalled witnesses are not favored in federal habeas corpus review because allegations of what the

witness would have testified are largely speculative." *Evans v. Cockrell,* 285 F.3d 370, 377 (5th Cir. 2002). The decision to present witness testimony is essentially trial strategy and thus within counsel's domain. *See United States v. Cockrell,* 720 F.2d 1423, 1427 (5th Cir. 1983). For a petitioner to prevail with an uncalled-witness claim, he must demonstrate that the witness would have testified at trial and that the testimony would have been favorable. *See Boyd V. Estelle,* 661 F.2d 388, 390 (5th Cir. 1981). This demonstration is "required for uncalled lay and expert witnesses alike." *See Day v. Quarterman,* 566 F.3d 527, 538 (5th Cir. 2009). Petitioner presented no affidavits or other evidence to establish what the substance of any expert testimony would have been and how it would have benefitted his defense. Petitioner's reliance upon the Fourth Circuit decision in *Elmore v. Ozmint,* 661 F.3d 783 (4th Cir. 2011), is unpersuasive. In *Elmore,* counsel failed to investigate forensic evidence despite the fact that blood fingerprints from the victim's bathroom and hairs recovered from the victim's body matched neither the victim nor the defendant, despite irregularities in the evidence's chain of custody, and despite nearly a three-day window within which the victim may have died. The facts in *Elmore* are readily distinguishable from those of Petitioner's case.

## C. Trial-Court Error

Under his second ground, Petitioner claims that the trial

court erred by instructing the jury not to "concern [themselves] with any objections or my ruling, allowing the jury to consider illegal evidence." (Pet. 6, doc. 1.) The record reflects that the trial court instructed the jury, in relevant part, as follows:

> During the course of the trial, the attorneys may make objections. This is a necessary procedure during a trial, and when an objection is made I must rule on it. You must not concern yourself with the objections or my rulings. You must consider only the testimony or exhibits to which I have admitted. You must exclude or not consider evidence that I instruct you to disregard. That's the instruction with regard to objections.

(Reporter's R., vol. 8, 77, doc. 13-18.)

The state habeas court concluded that complained-of instruction of the trial court was "clear, concise and did not deny [Petitioner] due process of law." (SHR 151, doc. 16-43.) Petitioner fails to demonstrate that the state court's decision was contrary to, or an unreasonable application, of federal law.

Errors in jury instructions are generally not cognizable in federal habeas corpus unless they deprive the petitioner of a fundamentally fair trial. *See Henderson v. Kibbe,* 431 U.S. 145, 154 (1977). A habeas petitioner challenging a state trial court's jury instruction must establish that the instruction "by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten,* 414 U.S. 141, 147 (1973). The challenged instruction must not be viewed in isolation; the habeas court should consider the context of the instructions as a whole as well as the entire trial record. *See Estelle v. McGuire,* 502 U.S.

62, 72 (1991). Petitioner fails to demonstrate how the complained-of instruction was erroneous as a matter of state or federal law. And, nothing in the record suggests that the instruction had the unintended effect of "allow[ing] the jury to consider testimony illegally presented where objections were sustained by the [trial] court." The record in this case fails to reflect that any error in jury instructions denied Petitioner a constitutionally fair trial.

### D. Prosecutorial Misconduct

Under his third ground, Petitioner claims that the prosecution "did a poor investigation of the offense" and "simply wanted to win" instead of seeking justice for the victim, in violation of the ABA Model Rules. (Pet. 7, doc. 1.) According to Petitioner, the state "found no evidence to implicate [him] except phone information that has been shown to be insufficient"; thus, the prosecution had "a duty . . . to 'refrain from prosecuting a charge that [it knew was] not supported by probable cause.'" (Id. at 6.)

Although the state habeas court did not enter any particularized findings regarding this claim, the court did conclude that the actions of the state's attorney were "at all pertinent times supported by probable cause." (SHR 151, doc. 16-43.) Petitioner fails to demonstrate that the state court's decision constitutes an unreasonable application of federal law or that its determination was unreasonable in light of the facts presented in state court. Although a prosecutor may have a

professional and legal duty to fairly investigate a case, such duty does not extend "to conduct a defendant's investigation or assist in the presentation of the defense's case." *United States v. Marrero,* 904 F.2d 251, 261 (5th Cir. 1990). There is no constitutional duty to investigate a crime thoroughly. To the extent that there is an extra-constitutional duty, its breach does not entitle a petitioner to habeas relief unless the breach is of such magnitude as to violate due process—*i.e.,* of "such magnitude as to render the trial fundamentally unfair." *See Foy v. Donnelly,* 959 F.2d 1307, 1316 (5th Cir. 1992) (holding that "[p]rosecutorial misconduct implicates due process concerns"). "A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Foy,* 959 F.2d at 1317 (internal quotation marks omitted). Based on the investigation by law enforcement, including the interview with Petitioner who failed to provide a verifiable alibi, there was probable cause to believe Petitioner was guilty of the murder. Petitioner presented nothing in state court to show a reasonable probability that the outcome of his criminal prosecution might have been different with further investigation by the prosecutor.

**E. Interview with Law Enforcement**

Under his fourth ground, Petitioner claims that the trial court erred by overruling defense objections to admission of his

recorded interrogation by the police absent *Miranda* warnings. (Pet. 7, doc. 1; Pet'r's Mem. 8-9.) The state habeas court determined that Petitioner's recorded statement to law enforcement was freely and voluntarily given and did not stem from custodial interrogation. (SHR 152, doc. 16-43.) Petitioner fails to demonstrate that the state court's decision is contrary to, or an unreasonable application of, federal law or based on an unreasonable determination of the facts in light of the evidence presented in state court.

An individual is "in custody" for *Miranda* purposes when placed under formal arrest or when a reasonable person in the same position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. *See United States v. Bengivenga,* 845 F.2d 593, 596 (5th Cir. 1988) (en banc). In this case, there was clearly no formal arrest and no reasonable person in Petitioner's position would have understood the interview to be a restraint on freedom of movement of the degree associated with a formal arrest. Petitioner voluntarily agreed to meet with Ranger Briley and was not told that he was not free to leave; Ranger Briley did not use coercive influences or deprive Petitioner of food, drink, or bathroom breaks; and, at the end of the interview, Petitioner left.

**F. Sufficiency of the Evidence**

Under his sixth ground, Petitioner claims that the state

appellate court erred by denying his sufficiency-of-the-evidence claim on appeal. According to Petitioner, several courts have agreed that "cellphone sector data" is unreliable and "the gunpowder residue found on his jacket can be shown to have come from a HILTI stud gun" he used while working. (Pet. 8, doc. 1.)

Federal habeas review of a legal sufficiency claim is extremely limited. The inquiry in a legal-sufficiency analysis requires only that a reviewing court determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). This standard applies to both direct and circumstantial evidence. *Schrader v. Whitley,* 904 F.2d 282, 287 (5th Cir. 1990). In conducting a *Jackson* review, a federal habeas court may not substitute its view of the evidence for that of the factfinder, but must consider all of the evidence in the light most favorable to the prosecution, with all reasonable inferences to be made in support of the jury's verdict. *See United States v. Moser,* 123 F.3d 813, 819 (5th Cir. 1997); *Weeks v. Scott,* 55 F.3d 1059, 1061 (5th Cir. 1995). Where a state appellate court has conducted a thoughtful review of the evidence, its determination is entitled to great deference. *See Callins v. Collins,* 998 F.2d 269, 276 (5th Cir. 1993).

Based on the evidence adduced at trial, and applying the

*Jackson* standard, the state appellate court addressed the issue as follows:

### III. *Standard of Review*

We review the sufficiency of the evidence to determine whether any rational jury could have found [Petitioner] guilty beyond a reasonable doubt. Following that standard, we review all the evidence in the light most favorable to the verdict and decide whether any rational jury could have found, based on the evidence or reasonable inferences from it, each element of the offense beyond a reasonable doubt. When we review the sufficiency of the evidence, we look at "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." The trier of fact is the sole judge of the weight of the evidence and credibility of the witnesses, and may believe any portion of a witness's testimony. We defer to the trier of fact's resolution of any conflicts in the evidence and presume that the trier of fact resolved such conflicts in favor of the verdict.

### IV. *Analysis*

[Petitioner] argues that the State failed to adduce sufficient evidence to convict him of the murder of Sewalt. The State asserts that it established each and every element of the offense beyond a reasonable doubt. As we explain below, we agree with the State that a rational jury could have found beyond a reasonable doubt that the evidence, or reasonable inferences from it, proved that [Petitioner] intentionally or knowingly caused the death of Sewalt when he shot Sewalt with a firearm.

*A. Law enforcement investigates the victim's murder.*

While the police were still at the victim's residence investigating his murder, [Petitioner] appeared at the entry gate, nervously spoke to police, and left his contact information. When questioned later in the evening by police, he explained that he had borrowed $16,000 from the victim, who held the title to his Dodge pickup as collateral. He said that he repaid the victim with payments totaling $18,000 dollars. However, bank

records did not reflect any payments on the pickup, which was part of the victim's floor plan financing. On February 13, 2013, police found the title to the Dodge pickup at [Petitioner]'s home.

*B. The day before and the day of the murder.*

Saunders explained that, the day before the murder, he and the victim had discussed his purchase of [Petitioner]'s pickup for $16,000. On the morning of the murder, the victim went to Garrison's office and told Walker that he planned to leave the title to [Petitioner]'s pickup with her so that [Petitioner] could pay Walker, but the victim took the title with him. Gilliam explained that she was to take the title to the bank if [Petitioner] failed to pay the loan in full before her father let [sic] for his cruise.

On the evening of the murder, Ranger Briley interviewed [Petitioner], who claimed that, around 9:00 a.m. to 9:30 a.m. that morning, he went to the Allsup's store located at Highway 108 and South Loop 377. Afterward, he spoke to Luke Groth on the south side of town. He said that he may have gone to Ace Hardware on the south side of town and that he may also have gone to watch Lucero work with his horses. Around 3:00 p.m. that day, he picked up his daughter from school. Ranger Briley could not verify all of this information, so he worked to confirm [Petitioner]'s movements on the morning of the murder.

*C. Law enforcement received security-camera recordings from the courthouse annex and hospital and cell phone records from [Petitioner] and the victim.*

During its investigation, law enforcement collected security-camera video recordings from locations in Stephenville and cell phone records from [Petitioner] and the victim. From the videos, Investigator Woodruff determined that the victim drove his pickup and trailer in a northerly direction in front of the courthouse at 10:35 a.m. Less than a minute later, [Petitioner]'s Dodge pickup appeared in the same video traveling in the same direction. At 10:35 a.m., security camera footage from the hospital showed the victim's pickup and trailer traveling in a northerly direction. Again, less than a minute later, [Petitioner]'s pickup appeared behind the

victim going in the same direction. At 11:11 a.m., the hospital security-camera footage showed [Petitioner]'s Dodge pickup traveling in a southerly direction. The victim's cell phone records indicated that [Petitioner] spoke to the victim by phone at 9:28 a.m. on the day of the murder. The last call that the victim made was at 10:28 a.m.

D. Law enforcement analyzed and mapped [Petitioner]'s cell phone pings to towers.

At approximately 10:30 a.m. on the morning of the murder, [Petitioner]'s phone "pinged" towers in the green sector and then moved through the blue sector to the purple or pink sectors near the victim's home. An hour later at approximately 11:30 a.m., [Petitioner]'s phone pinged towers in the green sector where his home was located. [Petitioner]'s phone traveled from the green sector to the pink sector during the time-period in which Investigator Woodruff thought the victim had been murdered. [Petitioner] never told police that he had gone north of Loop 377 that day or that he had traveled past the courthouse and hospital twice the morning of the murder.

*E. The State adduced evidence of the victim's wounds and cause of death and evidence of gunshot residue on [Petitioner]'s orange pullover.*

The victim had three close-range gunshot wounds to the head, which were lethal and not self-inflicted. Gunshot residue was found on [Petitioner]'s orange pullover. Ranger Briley interviewed Palmer and Garrison, both of whom had corroborated alibis.

V. *Conclusion*

When the jury deliberated on all of the evidence adduced by the State, the jury apparently chose to believe the witnesses presented by the State. The trier of fact is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe any portion of a witness's testimony. We defer to the jury because it had the responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." "Each fact need not point directly and

> independently to the guilt of the appellant, as long as
> the cumulative force of all the incriminating
> circumstances is sufficient to support the conviction."
> After a review of the record, we hold that the jury had
> sufficient evidence to find beyond a reasonable doubt
> that [Petitioner] murdered Sewalt.

(Mem. Op. 6-10. doc. 13-4 (citations omitted).)

Petitioner fails to demonstrate that the state court's decision is contrary to, or an unreasonable application of, the *Jackson* standard or based on an unreasonable determination of the facts in light of the evidence presented in state court. Either direct or circumstantial evidence can contribute to the sufficiency of the evidence underlying the conviction. Viewing the totality of the evidence in the light most favorable to the verdict, a rational jury could have reasonably inferred based on the circumstantial evidence that Petitioner had motive to kill Sewalt and intentionally shot him in the head with a firearm, which resulted in his death.

Under his fifth ground, Petitioner claims that the state habeas court erred by failing to address his claim that the cell-phone evidence was insufficient. (Pet. 8, doc. 1.) This claim is refuted by the record. The state habeas court expressly found that the "evidence produced upon the trial of this case was adequate and sufficient to support the verdict of guilty returned by the jury" and concluded that the "evidence produced upon the trial of this case was sufficient to support the conviction of [Petitioner] beyond a reasonable doubt." (SHR 151, doc. 16-43.) Although a

sufficiency-of-the-evidence claim is generally not cognizable on state habeas review, the court clearly considered the claim and found it to be without merit. Although perfunctory, it appears the state court's disposition of the claim constituted an adjudication on the merits. *See Green v. Johnson,* 116 F.3d 1115, 1121 (5th Cir. 1997).

## V. CONCLUSION

For the reasons discussed, the Court DENIES Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Further, Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253. A certificate of appealability may issue "only if the petitioner has made a substantial showing of the denial of a constitutional right." *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003). "Under this standard, when a district court denies habeas relief by rejecting constitutional claims on their merits, 'the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *McGowen v. Thaler,* 675 F.3d 482, 498 (5th Cir. 2012) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). When the district court denies the petition on procedural grounds without reaching the merits, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and

that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (quoting *Slack,* 529 U.S. at 484). Petitioner has not made a showing that reasonable jurists would question this Court's resolution of Petitioner's constitutional claims and/or procedural rulings. Therefore, a certificate of appealability should not issue.

SIGNED January 4, 2019.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE